KAUKAU KAHULA, ALBERT TRASK, J. P. MENDIOLA, ISABELLA MAHINAKU LOVELL, SOMETIMES KNOWN AS BELLA MENDIOLA, J. J. DUNNE AND J. J. DUNNE AS ADMINISTRATOR OF THE ESTATE OF ANA KINI KAHILINA, DECEASED, *v.* SAMUEL KANEWANUI, AS ADMINISTRATOR OF THE ESTATE OF ISAAC H. KAHILINA, DECEASED, ELIZABETH KAIO, ROSE K. KAU-KAHA, HANNAH SCOTE, SOMETIMES CALLED HANNAH SCOTT, PAULIKEAWE, AND A. K. MIKA.

APPEAL FROM CIRCUIT JUDGE, FIFTH CIRCUIT.

ARGUED APRIL 16, 1906.          DECIDED APRIL 30, 1906.

FREAR, C.J., HARTWELL AND WILDER, JJ.

BILL TO SET ASIDE WIFE'S DEED TO HUSBAND THROUGH M., THE INTERME-
DIARY GRANTEE, ALLEGED TO HAVE BEEN OBTAINED FROM HER BY FRAUD,
UNDUE INFLUENCE AND DURESS.

The deeds were made April 15, 1890, the wife died the following February and the husband November 17, 1902. A suit to set aside the deed was brought July 18, 1903. M., the intermediary grantee, was the witness mainly relied upon by the plaintiffs. He had refused to give them information to support a bill to set aside

the deed prepared by an attorney at the request of the plaintiff
Trask in behalf of himself and the other heirs of the wife during
the husband's lifetime.  Held:  That there was no evidence of
fraud or undue influence and that the evidence of duress was no+
sufficient to justify a decree setting aside the deed, particularly in
view of the delay in bringing the suit.

ID.—*practice—misjoinder of administrators—summons giving certain
defendants more time to appear than required by rule—issuing sec-
ond summons to a defendant in place of one objected to as not served
by an authorized officer.*

  Held:  The administrators of the respective estates of the wife
and husband were not properly joined, the one as a co-plaintiff and
the other as a co-defendant.  Motions to quash the second sum-
mons, as well as that which allowed more time than was requested,
were properly denied.

ID.—*joinder of M., as co-defendant—amendment to bill during trial—
praying for more than equitable relief.*

  M. was a proper co-defendant.  The court properly allowed an
amendment of the bill at the trial to show the interest of a co-
plaintiff, T.  If a bill prays for more than equitable relief and a
decree grants it, it is good as far as equitable relief is prayed for
or granted.

## OPINION OF THE COURT BY HARTWELL, J.

The plaintiffs, July 18, 1903, brought a bill to set aside
two conveyances made April 15, 1890, whereby Ana Kini,
who died in February, 1891, wife of I. H. Kahilina, who died
November 17, 1902, conveyed to the defendant, H. A. Mika, all
her property, being an ahupuaa of land of several hundred acres
and certain other parcels upon the island of Kauai, valued at
$27,198, excepting six acres each to her two sisters and grand-
son and five acres each to three moopunas, being two grand-
nephews and a grandniece ; Mika, by the other deed, conveying
the same to the husband, Kahilina, a consideration of $50
being named in each of the two conveyances.

The bill in substance charges that the husband secured the
execution of these deeds by fraud, duress and undue influence
exercised by him upon his wife and that the defendant Mika
conspired with him in the fraud.  The summons required the

defendants to appear twenty days after service. Two of the defendants moved to quash this summons on the ground that by circuit court rule 21 "the time for answering shall be ten days after service if the defendants reside on the Island of Oahu and twenty days after service if made upon either of the other Islands," the objection being that in regard to these two defendants the time for appearing was longer than the rule required. Another defendant having objected to the summons on the ground that it had not been served upon her by an authorized officer, a second summons was issued to her, service of the first having been vacated. That defendant then objected to the second summons on the ground that it was unauthorized. The motions to quash the summons made by the two defendants and to quash the second summons made by the third defendant were denied, as we think, properly.

All the defendants except Mika then demurred for lack of jurisdiction because of the failure to issue and serve such summons as the law provides, want of equity, misjoinder of Trask as a party plaintiff, the bill not showing that he had any interest in the land, misjoinder of Dunne as administrator of the estate of Ana Kini, misjoinder of the defendant Kanewanui as administrator of the estate of Kahilina, misjoinder of the defendant Mika, laches, multifariousness in seeking equitable relief by cancelation of the deeds, together with legal relief by quieting the plaintiffs' title. The demurrer was overruled and the defendants except Mika then answered over.

The administrators ought not to have been made parties, the administrator of the estate of Ana Kini not appearing to be concerned in the land for payment of the debts of the intestate or otherwise and no relief being sought against the administrator of the estate of Kahilina. Relief being sought against Mika he was properly a co-defendant.

The plaintiff Trask's interest, under the conveyance to himself of his father's title, was shown during the trial and the bill was amended accordingly by consent of court. The allowance of the amendment we consider to have been correct practice.

If, as appears, the bill prays for other than equitable relief

and the decree goes further than to grant it each would be good in respect of the equitable relief sought and granted.

The plaintiffs, being a surviving sister of the decedent Ana Kini and grantees of the respective estates of the other sisters and their heirs, are entitled to bring the suit against the defendants as heirs at law of the estate of the deceased husband Kahilina.

As the answer, besides denying the charges in the bill, sets up the defense of laches, we shall consider that defense in connection with the evidence on both sides. The averments in the bill, however, do not appear to us to have authorized its dismissal on demurrer on the ground that they do not sufficiently explain the delay in bringing suit.

The judge, after hearing the evidence, found that the charges in the bill were sustained and granted the decree prayed for. Without detailing the elaborate averments in the bill and answer, it will suffice to state the facts disclosed by the evidence on which the plaintiffs base their charges.

The case presented by the bill is that of a man marrying a woman much older than himself and without personal attractions with the purpose of getting her property, he being of a shrewd aggressive nature and she of a timid yielding disposition, inexperienced in business and dominated by his strong will; that he rudely thwarted her wish to provide for her two surviving sisters by giving them out of the seven hundred or more acres of her land one hundred and fifty acres each; that about ten months before her death she conveyed to him through the defendant Mika all her property, except six pieces aggregating thirty-three acres to her sisters, grandnephews and grandniece, when weak in mind and body and under his compelling influence; and that the defendant Mika participated in the transaction, drawing the deeds, being the intermediary grantee, and abetting a scheme to procure the property.

The marriage, of which there was no issue, was in 1875, when Kini was, as we infer, not far from 55 years of age. Keawe testified that she "might have been over 60;" the sister Kahula, that she was herself over 80 and that there was one

child between herself and Kini; and Mrs. Kaio, that the children were "a year or so between." This would have made Kahula about 51 years old in 1875. Kahula also testified of Ana Kini bathing with her in the stream at her place, to which they had ridden horseback, shortly before she died. It is unlikely that Ana Kini was then much, if any, over 70 years of age. It was customary among Hawaiians for women to marry younger husbands and to propose marriage to them. Ana Kini was a widow and may well have wished a husband who would protect her and look after her property. The evidence of his mercenary disposition is that the witness Keawe heard him tell her that he did not marry her for love but for her property, this being when he was under the influence of liquor while they were at the house of David Trask, her grandnephew, and about two years before she died. Mika testified that shortly after the marriage he asked the husband how a young man like him should marry an old woman like her and that he answered that he didn't marry her on account of her shape but for her property. Mika lived at Koloa, 40 miles from Waipakea where Ana Kini and her husband and her relatives, about a half a mile from her, lived. Apart from his evidence, to which we will allude, there is nothing in the testimony from which to infer that the couple lived other than a happy quiet wedded life for about sixteen years and until her death, or that he habitually subjected her to his own will. The evidence of Mrs. Mendiola, a grandniece, was that on two occasions before she was twelve years old she heard them talking together—once he didn't want the children running over the land taking the fruit, when he scolded her and said her family were "no good" and he didn't want the children running around taking fruit, and the second time, six or seven months before her death, upon her complaining that she wanted to see her sisters, when she was crying and he scolded her and said he didn't want her to see them any more, and, evidently referring to these two occasions, that he treated her like a little child, would frighten her and scold her in a loud voice when she would tremble with fright. "Sometimes," said the witness, "he was

all right and other times he would be cross. He seemed to be treating her like a little child. Sometimes he would frighten her and scold her without any provocation; speak cross to her with a loud voice. Whenever he would speak to her in that loud voice she would tremble with fright." Sometimes at his house he treated us "very nice; was all right and kind."

If the reference to his treating her like a child, frightening and scolding her, talking in a loud voice to her did not refer merely to the two special occasions mentioned by the witness but was a matter of her general observation, it would be the kind of experience which unfortunately comes to many a married woman whose husband is not considered as dominating her will, but merely as a petulant man, inconsiderate of his wife's feelings. It is barely possible that the wife herself sometimes had a say. We are obliged to consider the evidence as rather trivial on this subject. Nor is there evidence from which we infer that Ana Kini was mentally weak.

Maile Keawe testified that Ana Kini, about two years before her death, "was not strong. Was kind of weak." Kahula says nothing about her sister's mental incapacity. The constable, Kuiki, who visited the Kahilina house and saw the deeds lying on the table and who thought Ana Kini must have been 80 years or more, says, "She was weak and could not walk upright; was very feeble," and that he judged from her being an old woman and feeble "that her mental condition was also weak;" that she "could not help herself, that there were some little children about her waiting upon her;" also that her husband "had to wait on her when they had their meals and get the food ready for her;" that he didn't know that he heard her speak at the time when he was there with Mika who was making out some papers. The constable's talk with Mika was to the effect that he asked him what those papers were, and after reading them turned to Mika and told him he was a rich man to get all this great tract of land for only $50. Mika said, "It is not so. Look at this," handing him the other deed from Mika to Kahilina. Then Kuiki says he told Mika, "This is not a correct deed. This is not right," and suggested "that the proper thing

would be that Kini deed this property to some of her own blood
relations and then from them to Kahilina, and then it would
be proper," to which Mika replied, "I can't help it. Whatever
I am told to do by Kahilina, that I am doing." When asked
how Ana Kini acted, he answered, "I cannot say. I was not
much taken with Ana Kini. She was in the room and then
would come out sometimes." The deeds, he says, had been com-
pleted but not executed then. Mika was drawing some other
paper. The next day the witness came again to the house and
dined there. His seeing children about the house and the
husband waiting upon the wife apparently refers to some time
after the execution of the deeds. If there was any compulsion
or duress upon Ana Kini, used upon that occasion by her hus-
band, the constable heard and saw nothing of it.

There is no evidence of fraud committed upon any person in
the transaction relating to the deeds, although Mika gave two
reasons against their validity, namely, that there "was no
delivery of the money and the deed, and the second reason is
that this old woman was infirm and old and it was *not made
clear* to her;" and Trask said that after Kahilina's death Mika
told him that the deed was fraudulent (apuka), but Mika denies
saying this. If the contents of the deed were misrepresented to
Ana Kini that would be a fraud, but compelling her by threats
to sign the deed, the contents of which were known to her, is
not what is ordinarily meant by fraud. Nor is there evidence
of undue influence in connection with the transaction other
than might result from the use of threats from the husband to
the wife.

The case, as presented by Mika's testimony, on which the
bill must stand or fall, is one of duress. The evidence of the
sister Kahula, an aged woman, who could not recall upon the
second day of testifying what her testimony had been the day
before, is rather fragmentary and incoherent, saying at one
time that the deeds "were shown to me before the death of Ana
Kini," upon an occasion which she finally fixes upon as the
day when the deeds were executed and when Mika was at the
house. She first says that she and her sister had no conversa-

tion with reference to the deeds; that she "objected to the papers to Kahilina. I told him I didn't like those papers, when he scolded me; told me that he didn't want me there and drove me out of the house. Everybody was around there and heard it who was there,—Kini, Isaac Kahilina, myself and Mika;" that her sister wanted to give her 150 acres and Kahilina objected that the land would all be gone if she was going to do that. Afterwards she said, "I merely saw the papers lying there and picked them up and looked them over," her sister at that time lying there but saying nothing else, being "frightened of Kahilina, who kept saying to her, 'what kind of a thing are you? You are a crazy old woman to give land away this way,' and she didn't dare to speak for fear of Kahilina;" Mika, as she says, being outside all this time. Nor did she converse with him about the deeds after she left the house. Mika asked her why she was crying and she told him that her brother-in-law had driven her out of the house, but said nothing about these papers that the witness could remember. She later on recollected that Kahilina first offered her three acres, but she "cried and went out because it was too small and Mika then spoke to Kahilina that you best give her three acres more and they offered me three acres more and that is how I got the three acres." Further on her testimony added that in the talk about the 150 acres that her sister wanted to give her and Kahilina objected to, he "got mad and said she was crazy and a bad woman and laid his hand on her,—assaulted her." At a later time she got the deed of her six acres from Kahilina in the presence of Ana Kini, when no conversation occurred. "She might have thought I ought to be satisfied with these six acres. She perhaps dare not say anything for fear of Kahilina." Kahula's evidence is not sufficient to show duress or undue influence. It must be remembered that the Hawaiian language is not capable of being exactly represented by English. For instance, the words translated as used by Kahilina to his wife might well be equivalent in English to his remonstrating with her in strong terms and telling her that it would be a crazy thing for her to do to give the sisters 150 acres apiece.

It is observable that it was only upon cross-examination that Kahula testified to her sister's expression of a wish to give her 150 acres, and to Kahilina's abusive language. No question was asked by the plaintiffs' counsel, which indicated that they relied upon this evidence or expected it.

We have then to consider what reliance to place upon Mika's testimony, and whether to regard it as corroborated to a certain extent by that of Kahula. According to him he had known Ana Kini for five years before her marriage to Kahilina, who was a friend of his, and he also knew her family. He guesses she was 85 years old in January, 1890, when, he says, "she was very weak and feeble. Her physical condition was very poor;" that "whenever she would hear Kahilina coming then she would take fright and shake with fear;" that he thought at that time "she had very poor mentality; that her condition was very poor; that when you would converse on any subject with her she would change the subject very frequently, like a little child, as near as you can say,—childish;" that Kahilina told him he "would like some paper made out—deed between his wife and him." Mika then, he says, told him that his wife could not deed to her husband but that it might be done by deeding to a third person who would deed it back to him; then, said Mika, "If you want to do that, you better find some responsible third person," Kini being present at the talk. Two or three months later he says he received four letters in succession each week from Kahilina saying, in the last letter, "He wanted me to go over very much as he had thought the matter over about the third person we talked of" and thought "I was the best one he could think of." He then went over to Waipakea where Kahilina said the same thing, telling him that he wanted him to make out the papers that way and that he didn't want "one bit of the property to go to any of her relatives," whereupon, says Mika, "I refused to; I said I would not agree to that because it is proper that you would let her give some of her property to some of her relatives." Kahilina then said, "If that is the case let them have one acre." Mika then said, "You better have a talk with your wife; you and she talk this matter over and agree on how much

you are going to give her relatives." Mika then retired and shortly after returned finding, he says, Kahula outside of the house who was crying because, as she said, she went in to see Kini "and Kahilina didn't like to have me go to see Kini and drove me out." Mika went inside, asked them if they had come to terms, and as neither spoke, he said to Ana Kini, "How is this? You better give some of your property to some of your relations and *don't be afraid of him,*" pointing to Kahilina. Then Mika said that he asked her, "How is this; what have you agreed to do? And she went to say that I agreed to give 150 acres, but she had no sooner got it out until Kahilina turned to her and said to her, you brute, you bad woman, what business have you to say that, I don't want you to give your people anything whatever. I didn't marry you for anything but your property and I am at a loss if you are going to do that way. I am a young man and married an old woman like you and I am not going to give my young body to you, an old woman, for nothing." Then, says Mika, "Kahilina said to me, you make out that paper immediately, because (to Kini) you are nearly dead. If you don't agree to this paper being made out this way I know what I will do with you." He says he "noticed Kini was shaking and quite frightened and I told her to stop, and suggested, how about ten acres, and at that Kahilina said it better be six," asking Ana Kini how that would suit her and "She nodded her head in affirmation." To the question whether the woman had any lawyer to look out for her and whether any was suggested, the answer was "No." To the question whether "anything was suggested at that time by anybody that an attorney or some outside friend should be got to speak and act for Ana Kini in this business," the witness replied, "I suggested it myself, and Kahilina said he could attend to those things himself. Kahilina spoke in a very loud voice, and cross—a cross manner."

If all this evidence of Mika could be taken to be true, the deed of Ana Kini, instead of being her voluntary act, might, perhaps, be regarded as extorted from her by her husband's threat; but Mika, notwithstanding the charge in the bill that

he abetted, and notwithstanding his own profuse expressions of regret for having taken part in what is called a fraud, could not be regarded as participating in the compulsion or duress, for he says he told her not to be afraid of Kahilina. It was Mika, moreover, who says he suggested that provision be made for her relatives and that a lawyer be called in to advise her; but there are reasons why we decline to accept, without qualification, his version of the transaction. According to Mrs. Kanewanui, a distant relative to Ana Kini, her child (keiki), frequently visiting in her family, the husband and wife, in her observation, "lived lovingly with one another." In 1886 she was sent for by Ana Kini who told her, in the presence of Mr. Kanewanui, that she wanted to transfer this land through her to her husband, giving as a reason "that this Kaukau (Kahula), she would wait until Kini was sick and then would come to Kini and ask for a division of the property and ask her to make over some of the property to her, and that in regard to the sister Rebeckah it was the same way," and that "on account of this her husband is the only one that is caring for her and she is coming to the conclusion that the best thing she can do is to make over this property to her husband." Mrs. Kanewanui "refused and told her, you have a number of sisters and grandchildren and you must consider this matter carefully." Her health, according to this witness, was good, as well as her mental condition up to within two months of her death. After hearing from the policeman Kuiki of the deed the witness was at Ana Kini's house and talked with her about it, learning from her precisely what provision she had made for her sisters and the others. At that time she found Kahilina ironing his wife's clothes, as she had seen him do before. After Ana Kini's death Kahilina leased part of the land to the Kilauea Plantation and had stock running on other parts of the land.

Kanewanui fully corroborates his wife's evidence, adding that Ana Kini mentioned as one reason for wishing to make the property over to her husband that she had great affection for him and that her own family "didn't seem to care for her; didn't seem to look after her," and that when she was sick the

sister Kahula "would come, but for no other reason than to ask her for a division of some of the property;" that the sister Rebeckah "would be wandering here and there away from the home and every time she came back all she wants is some of that property." Kahilina, he says, had made five other leases of the land. The Kanewanuis testified for the defendants. Their witness, Horace Crabbe, says he saw Mika in February, 1903, several times, the last occasion being at the Inter Island wharf, when Mika said he was there "on some land case" and that he was "one of the principal witnesses in Kahilina's property, the one who drew the deed;" that he heard Harvey, near by, ask Mika "if she (Kini) was not forced to sign the deed and Mika says, no, it was her own free will;" that Albert Trask had promised him $50 to change his evidence but had not paid it. Crabbe's wife testified that she was present at the wharf on the occasion referred to and heard Mika say that he was waiting for the $50 to be paid by Trask to change his evidence about the land sold to Kahilina. Mrs. Kaio, niece of Kahilina, testified that she was intimately acquainted with Ana and her husband; once had lived with them for nine months and again for two weeks, often staying with them over night; that he was "kind to her and she to him. He would often do a little housework;" that after her father's death in 1875 Kini said, "If your mother would only adopt you to us we would have an heir as we have no children ourselves." After her husband's death in 1889 Kini said, "You left us and got married and your husband is now dead and if you will come here and stay here and look after us we will make this property over to you." "I just simply said, no, I don't care to, and she didn't say anything further."

The evidence of the Kanewanuis and Mrs. Kaio is not disputed, although Mika, while admitting a conversation with Crabbe at the wharf and upon other occasions in Honolulu, is almost sure that he had no talk with Harvey, but did, he says, talk with Crabbe, who told him there was a woman named Kamaka who wanted to talk with him "about these matters;" that "I would get a big sum of money if I was to assist them—

help them in this case;" that he didn't tell Crabbe that the deed from Ana Kini was a good deed. "I wanted always to tell everybody that this deed was not right—was wrong. I admitted that there was a paper made. He asked me if there was and I said yes there was a deed, but nobody asked me about the validity of the deed. I would always tell them the trouble."

Thus, it appears that Kini at an early date considered making the land over to her husband and was unwilling to yield to importunities for the land from her sisters, owing to the care that he took of her and that they didn't care for her when she was ill. The defendants, the plaintiffs objecting, were not allowed to show that the land was not ancestral on Kini's side, but the fact remains that it does not appear that the land came from her side, and although by statute kindred of the half bood inherit equally, there would not be the same moral compulsion on the part of Kini to devise the land to her sisters if it were true that it came to her from her husband's family. Again, by the statute in force, during her married life she could not convey her land to any person without her husband's written consent and he was entitled to the entire income of the land during his life, inheriting one-half of it from her if she had made no conveyance.

The evidence of the notary, Alexander, called by the plaintiffs, who took and certified Kini's acknowledgment of the deed, signed by her in a firm hand and witnessed by him, is that he sat down at a table beside Mrs. Kahilina and that she signed the document before him. His certificate of acknowledgment is in the usual form,—that Kini and her husband separately acknowledged to him that they executed the instrument freely and voluntarily, and that Kini, upon examination by him separate and apart from her husband, further acknowledged that she executed the same without fear or compulsion of her said husband, and that he presumes that the certificate "speaks the truth" as he would not have signed it "if it had not spoken the truth;" although Mika says that Alexander had no interpreter; that it was he who told him what the deeds were, he then saying, "It is all right if you have made out papers from Ana Kini

to you and from you to Kahilina. It is all right. It is well enough." We cannot regard the notary's certificate as untrue simply because he does not remember more definitely than he stated, but Mika's attitude is thoroughly unsatisfactory and, under all the circumstances of the case, we are not willing, upon his testimony, to affirm the decree setting aside the deed.

The harsh language used by the husband to his wife, however reprehensible and uncalled for, was such as often is used by the class to which these people belonged and not infrequently by those in higher walks of life, and it need not be regarded as coercive in the sense of dominating the wife's will. There is no evidence of her cruel treatment by him, but only of kind acts. There was no concealment of the transaction. The deeds were promptly recorded, a sister was present when they were decided upon, Mika was no confederate in a plot to overpower or mislead the wife.

Perhaps the strongest objection to sustaining the bill is the delay of bringing suit during Kahilina's lifetime. We have before us a draft of a bill in equity by the plaintiff Trask and Kini's two sisters, Lapeka and Kaukau, against Kahilina and Mika to set aside this deed on the ground that it was procured "by fraud, constraint, compulsion, wilful misrepresentation and fraudulent concealment of the facts" and that Kini at the time was "about 80 years of age and enfeebled both in mind and body and was, furthermore, ignorant and illiterate." This bill was prepared, according to the testimony of Achi, who drew it, at the request of the plaintiff Trask, who, in his examination, had testified that he never heard of the deed from Kini to Mika or Mika to Kahilina until he learned it from Mr. Dunne, attorney for the plaintiffs, in the year 1903; that he never engaged or retained Achi to bring suit for himself to set aside the deed, nor consulted Achi as an attorney for that purpose. Achi, however, subsequently testified that Trask wanted him to prosecute this case but that he "failed to find evidence to support the allegations of the bill at the time;" that he wrote to Mika to tell him what he knew about the case, having been made to believe at first that he would be a witness for the plaintiffs, but

"his answer discouraged me. He refused to tell me anything about the case;" that he then told Trask, "If I can't get Mika or anybody, I would not file the bill;" that he sent Trask to Kauai "to turn Mika on our side. He went down and he said he could not get it."

Certainly Mika had long known that the plaintiffs wanted his evidence if he could testify against the validity of the deed. He says that he received Achi's letter and told Kahilina that he ought to answer it, the latter saying, "No, don't you answer this letter; let them find out for themselves." He thinks that if he answered, it was "this way,—screening the facts and not telling the truth;" doing so "out of pure friendship—love for Kahilina." He denies that Trask promised him $50, or that he told Crabbe so. He thinks that he might have said that his expenses going to Honolulu and back amounted to $50, that Trask paid. He gives as his reason for keeping the matter secret during Kahilina's lifetime that the latter was his particular friend, but since his death "I have been anxious to tell it ever since because I see I have wronged those people of Ana Kini." His conscience, he says, had troubled him only after Kahilina died and would not let him rest, "but the minute he died the whole secret is upon me and I feel that I had deprived, or would deprive these people who were the owners of this property and the whole trouble is upon my shoulders now since his death." Again, "While he was living the blame was on his own shoulders but since he died it came on me." Then he says, "I knew that the time would come when I should wash my hands of this." Referring to the time shortly after Kahilina's death when Sam Keanu and Pukalo went to Koloa to see Mika about the matter, he says, "It seems that Providence had sent them; that the time had come to wash my hands of this dirt and it seems that the Almighty had sent them there at that time." Mika's silence after the deed was executed until several weeks after Kahilina's death, a period of some twelve years, is not, in our opinion, sufficiently explained by his statement that it was out of regard for his friend. He seems to us to protest too much when he speaks of his troubled conscience and that he

was glad at last to divulge the facts. Well knowing the wish of the relatives to get the benefit of his evidence, he waited until they sent to him for the information which he had refused to give during Kahilina's lifetime; then he became a ready and willing witness. We do not fully rely on his evidence notwithstanding the important fact that the learned circuit judge took it to be true. The changing or omitting of a few words in the language which he says the husband used to the wife would leave the plaintiffs' case without any basis whatsoever. The suggestion, which he says he made to Kahilina, to call in the family for conference about the transaction, was uncalled for; they were represented by the sister Kahula. No one could have given her more independent advice than, as he says, he himself gave. His testimony gives us the impression that he really had nothing to tell which would add to the facts known to Kini's sister during the lifetime of herself and husband.

Decree appealed from reversed, bill dismissed.

*J. J. Dunne, J. W. Cathcart, (J. D. Willard* on the brief) and *C. H. Olson* for plaintiffs.

*C. W. Ashford (J. M. Kaneakua* with him on the brief) and *W. A. Kinney* for defendants.